UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HACKWORTH,<br>Plaintiff,<br>v.<br>E. AREVALOS,<br>Defendant. | No. 1:19-cv-1362-KES-CDB<br>ORDER GRANTING IN PART MOTION FOR JUDGMENT AND DENYING MOTION FOR A NEW TRIAL<br>(Doc. 165) |

Plaintiff Robert Hackworth, a state prisoner proceeding pro se, prevailed at a jury trial on First and Eighth Amendment claims against defendant E. Arevalos, a correctional officer at California Substance Abuse Treatment Facility ("SATF"). Doc. 157. The jury found that Arevalos retaliated against Hackworth when, after he threatened to file an inmate grievance against her, she filed a false report accusing him of indecent exposure. *Id.*; Doc. 150 at 5. The jury also found that she failed to protect Hackworth because, following her false accusation, he was labelled a sex offender and was attacked by other inmates. *Id.* The jury awarded compensatory damages and punitive damages separately as to each claim. *Id.*; Doc. 158.

Arevalos moves for judgment as a matter of law or, in the alternative, for a new trial. Doc. 165. She contends that the evidence presented at trial was insufficient to support the jury's Eighth Amendment verdict and that the punitive damages award was unconstitutionally

excessive. *Id.* Because the evidence was insufficient to support an essential element of the Eighth Amendment claim, the Court grants the Rule 50(b) motion as to that claim, finds that Arevalos is entitled to judgment as a matter of law on the Eighth Amendment claim, and vacates the compensatory damages and punitive damages awards on the Eighth Amendment claim. The Court also reduces the punitive damages award on the First Amendment claim from a ratio of twelve-to-one to a ratio of nine-to-one. The Court denies the motion for a new trial.

## I. **Background**

In resolving a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b), the Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citations omitted). Even though the Court should "review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

Drawing all reasonable inferences in Hackworth's favor, the evidence showed the following:

Arevalos was a control booth officer at SATF prison in the section of the facility where Hackworth was housed. Doc. 162 ("Trial Tr. Day One") at 185:08–186:16. According to Hackworth and his witness, Andre Revis, Arevalos and Hackworth did not get along and argued constantly. *Id.* at 160:03–07; Doc. 163 ("Trial Tr. Day Two") at 28:23–29:09. On March 1, 2018, Arevalos learned that Hackworth was concerned about a missing package. Trial Tr. Day One at 185:08–186:16. Arevalos told Hackworth that she would send the package back to the sender if it were re-delivered. *Id.* In response, Hackworth told her he would file an inmate grievance against her. *Id.* Arevalos replied, "Okay, I got something for you. You just wait." *Id.*[1]

Soon thereafter, Arevalos accused Hackworth of masturbating in his cell. *Id.* at 159:08–

---

[1] At trial, Hackworth's witness, Andre Revis, testified that he overheard this conversation. Trial Tr. Day Two at 28:06–32:02. Hackworth also testified on direct examination that Arevalos said these words to him on two separate occasions. Trial Tr. Day One at 186:15–187:2.

23. In her report, she wrote that he sat on a stool at the back of his cell and looked directly at her as he did it. *Id.*; Trial Tr. Day Two at 76:24–79:2. Arevalos phoned Sergeant Joseph Brainard to report what she had seen. Trial Tr. Day Two at 79:18. Arevalos also told officer Pedro Lara, who worked in the same section, that she thought Hackworth was masturbating, and she instructed Lara to go to Hackworth's cell to inspect what he was doing. Trial Tr. Day One 159:08–23; Trial Tr. Day Two at 79:03–80:01, 129:23–131:12.

Officer Craig Knight accompanied Lara, and the two approached Hackworth's door. *Id.* Neither of them saw Hackworth masturbating. *Id.*; Trial Tr. Day Two at 136:21–139:14, 144:02–146:13, 148:07–149:22. When the two officers arrived at the cell, they told Hackworth that Sergeant Brainard wanted to speak with him but refused to tell him why. *See id.* at 187:21–188:04; *see also* Trial Tr. Day Two at 137:14–140:07. The officers then cuffed Hackworth and transported him to the program office, where Sergeant Brainard awaited, for questioning. *Id.*

When Hackworth arrived at the program office, Sergeant Brainard and Lieutenant Stoble questioned him briefly, and Hackworth denied any wrongdoing. *Id.* at 188:05–188:17; Trial Tr. Day Two at 160:01–162:20. Notwithstanding Hackworth's denial of the accusation, the officers prepared a lockup order, and Hackworth was not permitted to return to his cell in SATF. *Id.* at 188:05–189:18; Trial Tr. Day Two at 160:01–162:20. The evidence at trial was that Hackworth did not have a prior sex offense record.[2] *See* Trial Tr. Day One at 189:17–189:21 (Hackworth testified at trial, "I'm not a sex offender. I'm in jail for robbery. . . . I've never committed a sex crime in my life . . .").

Hackworth was sent to solitary confinement for over a week, then placed in the Indecent Exposure Pilot Program ("IEX Program") at California State Prison, Corcoran. *Id.*; Trial Exs. 5, 8. The IEX Program was a pilot program instituted by the California Department of Corrections and Rehabilitation to punish those who commit sex offenses like indecent exposure in prison. Trial Ex. 8; Trial Tr. Day One at 189:17–189:25. It modified the sanctions for certain sex

[2] On cross-examination, when defense counsel asked whether he had been convicted of sex offenses in the past, Hackworth answered yes, Trial Tr. Day One at 236:14–237:22, but Hackworth clarified: "I was found guilty . . . I appealed it . . . and it was reversed." *Id.* at 237:01–237:08.

offenses; instead of solitary confinement, the usual punishment for indecent exposure, all prisoners placed in the IEX Program were "clustered" together in an IEX housing unit at California State Prison, Corcoran. *See* Trial Ex. 8.

Prison policy mandated that participants in the IEX Program be identified in several ways while in the program. Yellow placards were placed on the door of every cell which contained a prisoner with an IEX charge. *Id.* Additionally, prisoners were assigned an "R" suffix to their custody designations. Trial Ex. 9. The "R" suffix is a designation that is reserved for sex offenders. *See* Trial Tr. Day One at 196:23–197:04; Cal. Code Regs. tit. 15 § 3377.1 (2024). Hackworth was required to participate in the IEX Program for ninety-eight days, from March 13, 2018, to June 19, 2018. Trial Ex. 7. On May 10, 2018, there was a disciplinary hearing on the indecent exposure charge, at which the hearing official made a finding that Hackworth was not guilty. Trial Tr. Day One at 159:11–159:23. The "R" suffix remained on Hackworth's custody designation for some time after the disciplinary hearing. *See* Trial Ex. 9. Hackworth was transferred back to SATF forty days after disciplinary hearing, on June 19, 2018. Trial Ex. 7.

During his time in the IEX program, Hackworth's original grievance against Arevalos was denied, and Hackworth appealed to the second level. Trial Ex. 2. On October 12, 2018, Hackworth was interviewed in connection with the appeal, and he alleged what had occurred since he filed the grievance against Arevalos, including her false allegation and his placement in the IEX Program. Trial Tr. Day One at 190:23–191:11; *see* Trial Ex. 2. On November 13, 2018, Hackworth's second level appeal was denied, and he appealed to the third level. *Id.*; Trial Ex. 2.

Hackworth and Revis testified that inmates in California's Level IV prisons do not tolerate sex offenders. Trial Tr. Day One at 189:14–189:25; Trial Tr. Day Two at 186:10–187:24. "[Being] accused of [a] sex crime in that type of environment put my life completely in jeopardy," Hackworth testified. *Id.*

On November 14, 2018, the day after he appealed the second level denial, Hackworth and Revis were returning from a trip to the law library when two inmates confronted Hackworth and, after a brief exchange, brutally assaulted him. *Id.* at 190:23–191:18. The inmates' stated motive for attacking Hackworth was their belief that he had masturbated in front of Arevalos.

Trial Tr. Day Two at 36:11–38:01. The inmates beat Hackworth, dragged him to the ground, and stabbed him in the face and neck multiple times. Trial Tr. Day One at 190:23–191:11; Trial Tr. Day Two at 35:2–36:2; Trial Ex. 13. The attackers were about thirty years younger than Hackworth. Trial Tr. Day Two at 35:23–36:01. Revis testified that the attack was "the worst[] form of elderly abuse" he had ever witnessed. *Id.* at 36:20–36:21.[3]

Following the attack, Hackworth was taken to see a doctor at the prison who recorded the injuries he suffered. *See* Trial Ex. 13. Prison officials refused to let Hackworth return to the general population at SATF due to the attack, and he was placed in solitary confinement for several weeks while the prison evaluated how to resolve the safety concerns. *Id.*; Trial Tr. Day One at 191:17–18. Eventually, Hackworth was transferred to Kern Valley State Prison. *See* Trial Tr. Day One at 191:17–18.

On September 27, 2019, Hackworth filed suit asserting claims under the First and Eighth Amendments pursuant to 42 U.S.C. § 1983.[4] Doc. 1 at 8. On October 18, 2024, the jury delivered a verdict in Hackworth's favor on both claims. Doc. 157. The jury awarded compensatory damages of $1,650 for the First Amendment violation and $100,000 for the Eighth Amendment violation, and awarded punitive damages of $20,000 for the First Amendment violation and $40,000 for the Eighth Amendment violation. Docs. 157, 158.

Arevalos moved at trial for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a), contending that there was insufficient evidence to support Hackworth's claims. Trial Tr. Day Two at 50:11–52:15. The Court denied the motion as to the First Amendment claim but reserved ruling on the motion as to the Eighth Amendment claim. Trial Tr. Day Three at 101:24–103:18. After trial, Arevalos timely filed a renewed motion for judgment as a matter of

[3] Hackworth and Revis testified this sort of attack by inmates of a different race in a Level IV prison would be allowed by other inmates only if the attacked inmate was a sex offender or harmed a female officer. *See* Doc. 164 ("Trial Tr. Day Three") at 27:04–28:01; Trial Tr. Day Two at 185:24–186:10. The inmates who attacked Hackworth were of a different race than Hackworth. *Id.* at 191:13–191:16; Trial Tr. Day Two at 35:23–36:01; Trial Ex. 13.

[4] Initially, Hackworth also asserted claims against Sergeant Brainard and Lieutenant Stohl. The claims against Brainard and Stohl were dismissed prior to trial. *See* Doc. 89.

law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative, a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a). Doc. 165. She argues in her Rule 50(b) motion that the evidence was insufficient to support the Eighth Amendment claim, and that the punitive damages awards are excessive. *See id.* Hackworth filed an opposition, *see* Doc. 187, and Arevalos filed a reply, *see* Doc. 188.[5]

## II. <u>Legal Standard</u>

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue. . . ." Fed. R. Civ. P. 50(a)(1); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).

A party must make a motion for judgment as a matter of law under Rule 50(a) before a case is submitted to the jury. Fed. R. Civ. P. 50(a)(2). The Court may deny or defer ruling on the motion, but if the jury returns a verdict against the moving party, the party may renew its motion under Rule 50(b). Fed. R. Civ. P. 50(b). In ruling on the renewed motion, the Court may either "allow judgment on the verdict, if the jury returned a verdict; order a new trial; or direct the entry of judgment as a matter of law." *Id.*

The standard for judgment as a matter of law "mirrors" the standard for summary judgment. *Reeves*, 530 U.S. at 150. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* (citations omitted). Even though the Court should "review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151.

A jury's verdict must be upheld under Rule 50(b) unless "the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell,* 443 F.3d 1050, 1062 (9th Cir. 2006); *see Harper v. City of L.A.,* 533 F.3d 1010, 1023 (9th Cir. 2008) (limiting Rule 50(b) judgments to cases in which "the *only* conclusion that a

---

[5] Hackworth's opposition deadline was extended numerous times to allow him time to obtain the trial transcripts. *See* Docs. 176, 181, 186.

reasonable jury could draw" is contrary to the jury's verdict). Rule 50 is a "demanding" standard that poses "a very high hurdle." *See Settlegood v. Portland Pub. Sch.*, 371 F.3d 503, 512, 513 (9th Cir. 2004). Said differently, judgment as a matter of law is not warranted if the jury's verdict "is supported by substantial evidence adequate to support the jury's findings, even if contrary findings are also possible." *See Dunlap v. Liberty Nat'l Prod., Inc.*, 878 F.3d 794, 797 (9th Cir. 2017) (citation omitted).

A party may also move for a new trial pursuant to Rule 59. Fed. R. Civ. P. 50(b). Under Rule 59, the Court may order a new trial if "the verdict is against the weight of the evidence, [] the damages are excessive, or [], for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, (1980). However, "a district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001). Rather, the court must have a "definite and firm conviction that a mistake has been committed" after "having given full respect to the jury's findings." *Landes Constr. Co. v. Royal Bank of Can.*, 833 F.2d 1365, 1372 (9th Cir. 1987) (citation omitted).

## III. <u>Discussion and Analysis</u>

### a. Motion for Judgment as a Matter of Law

#### i. The Evidence Was Insufficient to Support the Eighth Amendment Verdict.

In her renewed motion for judgment as a matter of law, Arevalos asserts that the evidence was insufficient to support the jury's Eighth Amendment verdict. Doc. 165 at 3–7.

The Eighth Amendment, with its prohibition on cruel and unusual punishments, demands that prison officials "take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527 (1984)). One such measure is the duty "to protect prisoners from violence at the hands of other inmates." *Id.* at 833 (quotations omitted). The Eighth Amendment imposes this duty to protect because

"[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders [must] pay for their offenses against society.'" *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "[H]aving stripped [prisoners] of virtually every means of self-protection and [having] foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833.

*Farmer* articulated that a prison official's failure to protect an inmate from violence violates the Eighth Amendment when two conditions are met. First, the prison official's action or inaction must result in a deprivation that is, "objectively, sufficiently serious." *Id.* (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). "For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.*

Second, the prison official must act with "deliberate indifference" to that risk. *Id.* In other words, a prison official must possess subjective knowledge of the risk and disregard it. *Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (citations omitted).

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.* at 842–43 (quotations omitted). Subsequent cases have articulated that the defendant's action must also be "both an actual and proximate cause of [the plaintiff's] injuries." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013) (citations omitted).

Arevalos argues that there was insufficient evidence to support the jury's Eighth

Amendment verdict because the evidence at trial cannot support a finding that Arevalos told inmates that he had masturbated in front of her.

Hackworth asserts that Arevalos was "caught in [] many lies" and that the jury could have disbelieved her testimony that she did not tell inmates about her false accusation against him. *See* Opp'n at 3, 5, 6. But "[w]hen the testimony of a witness is not believed, the trier of fact may simply disregard it." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485 (1984). "Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Id.*; *see Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576 (1951) ("[I]t is the jury's function to credit or discredit all or part of the testimony. But disbelief of [a witness's] testimony would not supply a want of proof."); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) ("Discredited testimony is not a sufficient basis for drawing an affirmative contrary conclusion."). While the jury could have disregarded Arevalos's testimony, in the absence of additional evidence, the jury's disbelief of her testimony is not sufficient to conclude that she did in fact tell inmates about her false accusation against Hackworth.

Hackworth also points out that he submitted exhibits which show that, when Arevalos was interviewed about Hackworth's grievance on April 27, 2018, she stated that she "does not give out [inmates'] personal information . . . ." Trial Ex. 2. Hackworth argues that this was a spontaneous statement "from out of nowhere," arguing that a spontaneous statement is "[usually an] admission of guilt." Opp'n at 3–4. But Arevalos's statement during the interview was not made "from out of nowhere." The exhibits that Hackworth points to make clear that Arevalos was interviewed regarding Hackworth's appeal of the denial of his grievance and his contention that Arevalos "[gave] out [his] personal information to inmates." *See* Trial Ex. 2. In this context, it seems clear that she made the statement that she "does not give out [inmates'] personal information" in response to Hackworth's allegation that she did do so. Her statement was not "from out of nowhere" and does not establish that she in fact told her false accusation to other inmates. Hackworth does not point to any other evidence which might sustain the jury's Eighth Amendment verdict on the grounds that Arevalos told inmates about her false accusation against him, and there was no such additional evidence at trial.

Hackworth also argues that Arevalos's false accusation that Hackworth had committed a sex offense would have created a substantial risk that other inmates would find out about the accusation and attack Hackworth because of it, and that by making the accusation, Arevalos was deliberately indifferent to that substantial risk.[6]

Before assessing the sufficiency of the evidence on this theory of the Eighth Amendment claim, the Court first notes what is *not* at issue. The jury concluded that Arevalos retaliated against Hackworth for exercising his First Amendment right to file a grievance against her when she falsely accused him of masturbating. Doc. 157. There was certainly sufficient evidence to support the jury's conclusion that Arevalos's accusation was false and that it violated Hackworth's First Amendment rights, as the Court addressed in ruling on Arevalos's Rule 50(a) motion at trial. *See* Trial Tr. Day Three at 101:23–103:10.

There was also admissible evidence that would permit the jury to reach several conclusions relevant to the Eighth Amendment claim. First, there was sufficient evidence to establish the first element of an Eighth Amendment violation—that Hackworth faced a substantial risk of serious harm. *See id.* at 98:21–99:04. One "can hardly conceive of a state's action bearing more stigmatizing consequences than the labeling of a prison inmate as a sex offender." *Neal v. Shimoda,* 131 F3d 818, 829 (9th Cir. 1997) (citations omitted). Sex offenders "are considered an anathema in the inmate subculture . . . [and] inmate norms call for their savage beating." *Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010); *Harris v. Atchley*, No. 22-cv-00529-EMC, 2023 WL 4850176, at *6 (N.D. Cal. Jul. 29, 2023) ("The Ninth Circuit repeatedly has recognized that sex offenders are at risk of being attacked by general population prisoners."). Hackworth and Revis testified that inmates at SATF abide by, essentially, an unwritten code to attack sex offenders and those who harm female officers. *See* Trial Tr. Day One at 190:17–190:25, 224:13–224:20 ("By Officer Arevalos saying that I . . . did anything to

---

[6] Arevalos argues that Hackworth did not assert this theory of the Eighth Amendment claim in his pleadings and that Hackworth "cannot be permitted to materially alter the nature of his claim during or after trial, thus preventing Arevalos from presenting evidence to address that altered claim." Doc. 165 at 6. The Court need not resolve this issue because, in any event, there is insufficient evidence to support the Eighth Amendment verdict on this theory.

her sexually, could get me harmed in a level 4 prison because the rapists, the child molesters and all [] is not allowed to walk those lines."); Trial Tr. Day Two at 186:19–187:13. The jury could have reasonably concluded that Hackworth faced a substantial risk of serious harm due to the false allegation and attendant sex offender label, if that information were to leak out to inmates.

There was also sufficient evidence for the jury to conclude that Arevalos's false accusation motivated the inmates' attack on Hackworth. Revis testified that the inmates said they were attacking Hackworth because they believed he had masturbated in front of Arevalos. Trial Tr. Day Two at 36:11–37:24; *see also* Trial Tr. Day One at 210:03–210:14. Circumstantial evidence also supported an inference that this was the inmates' motive, as the attackers were of a different race and were thirty years younger than Hackworth. Trial Tr. Day One at 191:13–191:16; Trial Tr. Day Two at 35:23–36:01, 185:24–185:10; Trial Ex. 13. Hackworth and Revis testified that prisoners follow an unwritten code that calls for violence against sex offenders regardless of race. *See* Trial Tr. Day Three at 27:04–28:01 (Hackworth testified, "[I]f you notice, I'm a Black man and in prison normally Hispanics or Whites can't put their hand on Black or vice versa . . . because it causes a riot to ensue. But . . . the assailants that assaulted me, they were White and Hispanic."); Trial Tr. Day Two at 185:24–186:10 (When asked, "[I]n your experience, when a female officer accuse[s] any inmate, whether he's Black, White, Hispanic, of a sexual crime . . . what happens to that inmate?" Revis answered that the "general population [will] address[] you for your conduct."). The jury could have reasonably concluded that the inmates attacked Hackworth because they believed he was a sex offender.

But there was not sufficient evidence to show that Arevalos was deliberately indifferent to that risk of harm because Hackworth failed to present evidence that Arevalos knew of a substantial risk that other inmates would find out about her false accusation. To establish deliberate indifference, Hackworth needed to show that Arevalos possessed a subjective knowledge of that risk and disregarded it. *Farmer*, 511 U.S. at 837. In the context of this case, Hackworth would have needed to present evidence that Arevalos must have known that (1) inmates routinely assault those labelled sex offenders, and (2) there was a substantial risk that

inmates would find out that Hackworth had been labelled a sex offender.

On the first point, the jury could have reasonably concluded that Arevalos knew that inmates labelled sex offenders faced a substantial risk of assault. Arevalos had been a correctional officer for eighteen years when she made the false accusation, *see* Trial Tr. Day Two at 72:10–72:13, and Hackworth and Revis both testified that inmate attacks on known sex offenders are common, *see* Trial Tr. Day One at 189:14–189:25; Trial Tr. Day Two at 185:24–187:09. "[I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding [and] pervasive . . . and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842–43. From this, the jury could have inferred that Arevalos knew there was a substantial risk that Hackworth would be attacked if other inmates found out about her accusation.

As to the second point, however, the jury could not have reasonably concluded that Arevalos knew there was a substantial risk that other inmates would learn of her accusation, because Hackworth did not present admissible evidence of *how* the inmates might have learned of the accusation.

When a prison official falsely accuses a prisoner of a sex offense, and the false accusation causes the prisoner to be identified as a sex offender through some means that other prisoners in the general population can observe, the prison official has acted with deliberate indifference to a substantial risk of serious harm. *See Morris v. Yavari*, No. CV 19-5798-SVW (KK), 2020 WL 4341724, at *4–6 (C.D. Cal. July 7, 2020) (finding a substantial risk of serious harm because the plaintiff was required to wear a jumpsuit that identified him as a sex offender, received death threats, and pled that "known [sex] offenders are always subjected to violence [and] even death by other inmates"); *Gilbert v. Fernald*, No. CV 20-1269-SVW (KS), 2020 WL 6484789, at *9 (C.D. Cal. Oct. 16, 2020) (finding a substantial risk of serious harm due to prison official's placement of yellow placards on the outside of plaintiff's cell which alerted other inmates that he was an accused sex offender); *Johnson v. Robinson*, No. 2:12-cv-2400-WBS-

DAD, 2015 WL 882021, at *14 (E.D. Cal. Mar. 2, 2015), *adopted* 2015 WL 3603942 (E.D. Cal. June 5, 2015), *aff'd* 692 F. App'x 371 (9th Cir. 2017) (finding a substantial risk of serious harm due to a prison official's placement of an "R-suffix" in the plaintiff's file which alerted other inmates that he was a sex offender); *Nailing v. Fosterer*, No. CIV S–09–2475–MCE–CMK, 2012 WL 1130655, at *8 (E.D. Cal. Mar. 2, 2012) (finding a failure to protect claim sufficiently pled where prison officials listed a sex offense on the plaintiff's chrono, which was circulated despite the "generally known risk sex offenders face in the prison general population"); *Knight v. Runnels*, No. CIV S-07-0751-FCD-CMK-P, 2007 WL 2390139, at *2 (E.D. Cal. Aug. 20, 2007) (finding a substantial risk of serious harm where a prison official "put an 'R-suffix' in [the plaintiff's] file knowing that, if [the] plaintiff was put in the general population, he would be stabbed").

In *Morris*, for example, the plaintiff pled that a prison official falsely accused him of indecent exposure knowing that the prison would place yellow placards on his cell and require him to wear a specialized jumpsuit that identified him as a sex offender to other general population inmates whenever he left his cell. No. CV 19-5798-SVW (KK), 2020 WL 4341724, at *2. In *Gilbert*, the plaintiff pled that a prison official falsely accused him of sexual misconduct knowing that prison policy required yellow placards to be placed on his cell windows and other inmates knew that the yellow placards were there to identify him as a sex offender. No. CV 20-1269-SVW (KS), 2020 WL 6484789, at *1–2. In *Nailing*, the plaintiff pled that prison officials incorrectly listed a sex offense on his classification chrono, and that the classification chrono was circulated to other inmates despite the fact that it was well known among prison staff that those labelled sex offenders were regularly attacked in prison. No. CIV S–09–2475–MCE–CMK, 2012 WL 1130655, at *1–2. Similarly, the court in *Brennan v. Aston* concluded that when a prison official stated aloud that an inmate was a "snitch" within earshot of other inmates, the prison official was deliberately indifferent to a substantial risk of serious harm because it is generally known that inmates labelled as "snitches" face a substantial risk of violence. No. 17-cv-1928-JCC-MLP, 2019 WL 5225047, at *9–10 (W.D. Wash. Aug. 16,

2019).

The distinction between this case and those cited above is that, here, there was no evidence at trial establishing a substantial risk that prisoners in the general population at SATF would find out about Arevalos's false accusation and the attendant sex offender label. There was no evidence that a yellow placard was placed on Hackworth's cell at SATF, where he was attacked, or that plaintiff's uniform at SATF had any designation that would have indicated a sex offender status. While yellow placards were placed on Hackworth's cell while he was in the IEX Program at California State Prison, Corcoran, that was a different prison from the one in which he was attacked.[7] Trial Ex. 8.

As in *Nailing*, Hackworth's chrono showed that he had been charged with a sex offense because there was an "R" suffix on his custody designation. *See* Trial Ex. 8; Tr. Day One at 196:23–197:04; Cal. Code Regs. tit. 15 § 3377.1 (2024). But in *Nailing*, the plaintiff alleged that prisoners' "chronos [were] circulated to all inmates . . . via prison mail, so that inmates can prove to one another that one is not a sex offender." No. CIV S–09–2475–MCE–CMK, 2012 WL 1130655, at *1. Here, there was no evidence that other prisoners were able to see or access Hackworth's chrono.

Lastly, unlike in *Brennan*, there was no evidence that Arevalos made the false accusation within earshot of other prisoners. Arevalos reported what she had allegedly seen while she was in the control booth, and there was no evidence that other prisoners were able to hear Arevalos or to see any written report of the incident. *See* Trial Tr. Day Two at 72:15–80:02 (describing the location of the control booth and the incident). When officers Lara and Knight approached Hackworth's cell to transport him to the program office, they did not answer his questions about why he was being taken there, and there was no evidence other inmates were alerted of Arevalos's false accusation by anything Lara or Knight said. *See* Trial Tr. Day One at 187:06–188:02. Moreover, Revis, who overheard Hackworth tell Arevalos that he was going to file a grievance against her, did not testify that he overheard Arevalos or any other officer say that they

---

[7] IEX offenders were also "clustered in a 180-design housing unit" apart from the other prisoners at California State Prison, Corcoran. Trial Ex. 8.

had seen him masturbating.[8] *See* Trial Tr. Day Two at 31:17–32:07.

In sum, the evidence presented at trial was insufficient to establish that Arevalos failed to protect Hackworth by falsely accusing him of a sex offense because there was no evidence to establish her subjective knowledge of a substantial risk that other inmates would find out about her accusation. Arevalos is therefore entitled to judgment as a matter of law on Hackworth's Eighth Amendment claim.

**ii. Due Process Limit on Punitive Damages**

Arevalos next argues that the punitive damages awarded for both claims are unconstitutionally excessive. Doc. 165 at 7–10. As the Court grants judgment as a matter of law for Arevalos on the Eighth Amendment claim, the punitive damages award for the Eighth Amendment claim is vacated. The Court turns to consideration of the punitive damages awarded on the First Amendment claim.

The Due Process Clause of the Fourteenth Amendment "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). While punitive damages serve the legitimate purpose of deterrence and retribution, there is a risk that they may be imposed in an arbitrary manner. *Id.* at 416–17. A trial court has a duty to review awards of punitive damages for disproportionality after the fact. *See Morgan v. Woessner*, 997 F.2d 1244, 1257 (9th Cir. 1993). "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426.

The Supreme Court has instructed trial courts to evaluate awards of punitive damages under three "guideposts": "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and

---

[8] On direct, Revis testified regarding the nature of the conversation. He stated he "could hear the conversation clearly. I mean, everybody in the dayroom can hear the conversation," which consisted of, "my understanding [was] you told her you were going to [file a grievance] . . . and [s]he told you, you go ahead and do what you going to do, I got something for you, I got something for you." Trial Tr. Day Two at 31:19–32:7.

the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418 (citing *BMW of North Am. v. Gore*, 517 U.S. 559, 575 (1996)). The Court evaluates each in turn.

First, the reprehensibility of the defendant's action is "the most important indicium of reasonableness of a punitive damages award." *Id.* at 419. To assess reprehensibility, courts consider whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Gore*, 517 U.S. at 576–77.

The jury could have concluded that Arevalos's conduct was reprehensible. The harm caused was more akin to physical than economic because, by falsely accusing Hackworth of indecent exposure in retaliation for exercising his constitutional right to file a grievance, Hackworth was forced into solitary confinement. Following his stay in solitary confinement, Hackworth was transferred to a different prison where he was forced to participate in the IEX Program with actual sex offenders.

Being falsely labelled a sex offender, especially in a prison environment, was also likely to cause severe emotional distress. *See Renchenski*, 622 F.3d at 326–27 (discussing the stigma associated with being labelled a sex offender in prison and cataloguing the various risks of physical and sexual violence faced by such inmates). As Hackworth testified, "I'm not a good guy," but "I'm not a sex offender. I'm in jail for robbery. I've never committed a sex offense in my life and I take offense to being accused of [a sex offense] because in my environment, a person accused of a sex crime [will] end up dead, period." Trial Tr. Day One at 189:17–189:21, 239:08–239:18.

A prisoner's right to file a grievance is one of a few "bedrock constitutional guarantees" he retains in prison, and without it, a prisoner "would be left with no viable mechanism to remedy prison injustices." *See Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005). Having found that Arevalos retaliated against Hackworth in violation of the First Amendment, by falsely accusing Hackworth because he indicated he was going to file a grievance against her, the jury

could have reasonably concluded that Arevalos's conduct was "malicious, oppressive, or in reckless disregard of the plaintiff's rights." *See* Doc. 150 at 36; *Howard v. Groover*, 706 F. Supp. 3d 1090, 1110 (D. Nev. 2023).

Second, the Court must evaluate the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award. *State Farm*, 538 U.S. at 418. While there is no bright-line ratio between compensatory and punitive damages awards, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. "Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (quotations omitted). "A higher ratio may [] be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *BMW of North Am.*, 517 U.S. at 582.

The Ninth Circuit "has warned district courts not to limit punitive damages to a [four-to-one] ratio, particularly in cases in which 'reprehensibility [is] especially high and the compensatory award[] is relatively low.'" *Howard*, 706 F. Supp. 3d at 1111 (quoting *Riley v. Volkswagen Group of Am., Inc.*, 51 F.4th 896, 902–03 (9th Cir. 2022)). Since *State Farm*, the Ninth Circuit has upheld punitive damages awards as high as nine-to-one on multiple occasions. *See Riley*, 51 F.4th at 902 (citing cases).

Here, the jury awarded compensatory damages of $1,650 and punitive damages of $20,000 on Hackworth's retaliation claim, resulting in a ratio of slightly more than twelve-to-one. Arevalos's conduct resulted in harm that is difficult to quantify, yet severe. For this reason, a high ratio may be appropriate.

Third, the Court must compare the punitive damages award and civil penalties authorized in similar cases. *State Farm*, 538 U.S. at 418. However, neither party has provided the Court with comparable civil penalties or comparable cases, *see* Docs. 187, 188, and there are no obvious comparisons as "[s]ection 1983 does not impose a civil penalty . . . ." *Lai v. City &*

*Cnty. of Honolulu*, 749 F.2d 588, 590 (9th Cir. 1984). This factor is therefore of limited value here.

Balancing the degree of reprehensibility with the Supreme Court's statement that "few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process," *State Farm*, 538 U.S. at 425, the Court finds that the punitive damages awarded for the First Amendment claim should be reduced to a nine-to-one ratio, a reduction from the current, approximately twelve-to-one ratio.

**b. Motion for New Trial**

Arevalos moves for a new trial on several grounds, two of which—that the Eighth Amendment verdict is against the weight of the evidence and that the damages are excessive—are an alternative to her motion for judgment as a matter of law. *See* Doc. 165 at 11. Given the Court's conclusion above that the Eighth Amendment verdict must be vacated and the punitive damages award on the First Amendment claim should be reduced, these issues need not be addressed further.

Arevalos also moves for a new trial on the grounds that Hackworth's conduct during the trial unduly prejudiced her. *See id.* She identifies two instances of improper conduct which relate to the First Amendment claim.

First, she asserts that Hackworth attempted to argue that the disciplinary hearing officer's not guilty finding constituted evidence that he had not committed indecent exposure. *See id.* The Court allowed the disciplinary hearing officer's report which contained the not guilty finding to be admitted for the limited purpose of establishing Arevalos's alleged motive to tell other prisoners that Hackworth had engaged in indecent exposure. *See* Trial Tr. Day One at 123:05–131:17. The Court did not allow it to be admitted for the purpose of establishing whether Hackworth engaged in the conduct. *See id.* The Court twice gave a limiting instruction to the jury about the disciplinary hearing officer's report, *see* Trial Tr. Day One at 207:05–207:22, 209:1–209:14, and the Court twice sustained Arevalos's objections to Hackworth's attempts to argue that the not guilty finding established that he had not engaged in indecent

exposure, *see* Trial Tr. Day One at 203:07–203:14, Trial Tr. Day Three at 225:21–226:24.

Arevalos identifies one instance where she did not object to Hackworth's argument that the hearing officer's not guilty finding established that he did not engage in indecent exposure. *See* Trial Tr. Day One at 196:23–197:21. A new trial should only be granted where the "flavor of misconduct . . . sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict," *Kehr v. Smith Barney,* 736 F.2d 1283, 1286 (9th Cir. 1984), and "[t]here is an even 'high[er] threshold' for granting a new trial where, as here, [a] defendant[] failed to object to the alleged misconduct during trial." *Settlegood v. Portland Pub. Schools*, 371 F.3d 503, 517 (9th Cir. 2004) (quoting *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.,* 785 F.2d 656, 658 (9th Cir. 1986)). The Court gave a limiting instruction about the hearing officer's not guilty finding shortly after this one instance and expressly told the jury that they were not to consider the evidence of the finding for its truth. *See* Trial Tr. Day One at 207:05–207:22, 208:25–209:13. "[I]n all cases, juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). Any prejudice to Arevalos from this one instance was mitigated by the Court's limiting instruction, by the Court sustaining Arevalos's other objections, and by Arevalos's own reminder, during her closing argument, that the hearing officer's finding was only admitted for a limited purpose. *See* Trial Tr. Day Two at 17:15–17:22. Accordingly, this conduct does not warrant a new trial.

Arevalos also argues that she was unduly prejudiced by Hackworth's comment, in his opening statement during the punitive damages portion of the trial, that the State would indemnify Arevalos for the compensatory damages award. *See* Trial Tr. Day Three at 61:20–61:24 (Hackworth argued that "she's a State employee. State's going to pay that, the first part."). First, this statement came in the bifurcated punitive damages portion of the trial, after the jury's initial verdict, and it therefore could not have affected the jury's underlying verdict on the claims and compensatory damages. Second, the Court sustained Arevalos's objection when Hackworth made the statement about indemnification. Trial Tr. Day Three at 61:20–62:02. "A judge's prompt corrective action in response to improper comments usually is sufficient to cure any problems arising from such improper comments." *United States v. Washington*, 462 F.3d 1124,

1136 (9th Cir. 2006).

While the Ninth Circuit has held that a new trial is warranted when a district court gives an explicit instruction to the jury that the State will indemnify an officer, *Larez v. Holcomb*, 16 F.3d 1513, 1519–20 (9th Cir. 1994), courts have also held that a new trial is not warranted when the question of whether an officer will be indemnified goes unanswered and when the court sustains objections to questions or argument about indemnification, *see Hernandez v. Hodges*, No. 20-cv-01183-AGT, 2023 WL 5336856, at *19 (N.D. Cal. Aug. 17, 2023); *Holmes v. Harris*, 845 F. App'x 604, 605 (9th Cir. 2021). Here, when the jury submitted a note during deliberations asking who would pay the compensatory damages, Doc. 155, the Court declined to answer that question, Trial Tr. Day Three at 112:05–112:13. There was therefore "no information about who would pay for the jury to consider" and "no evidence that the jury's verdict was caused or otherwise influenced by" Hackworth's statement. *Hernandez*, 2023 WL 5336856, at *19 (internal citations omitted).

Accordingly, a new trial is not warranted.

**IV. <u>Conclusion and Order</u>**

For the reasons explained above:

1. Defendant's motion for judgment as a matter of law, Doc. 165, is GRANTED as to the Eighth Amendment verdict and as to the amount of the punitive damages award on the First Amendment claim. The punitive damages award on the First Amendment claim is reduced to $14,850. The motion is otherwise denied.
2. Defendant's motion for a new trial, Doc. 165, is DENIED.
3. The Clerk of Court is directed to enter an amended judgment for plaintiff Hackworth consistent with this Order.

IT IS SO ORDERED.

Dated: July 13, 2026

[signature]

UNITED STATES DISTRICT JUDGE